United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>                Plaintiff,<br><br>        v.<br><br>LEMBRENT RUBIN,<br><br>                Defendant. | Case No.  18-cr-00568-CRB-1<br><br>**ORDER DENYING MOTION TO SUPPRESS** |

The government has charged Defendant Lembrent Rubin with one count of Hobbs Act robbery and one count of brandishing a firearm in furtherance of a crime of violence. The charges arise from an incident at a Safeway Pharmacy where a male suspect stole various medications while wielding a (possibly fake) firearm. Surveillance video captured the suspect entering the passenger side of a blue Jaguar near the store shortly after the robbery. Using an Automated License Plate Reader (ALPR) database, a San Francisco Police Department officer determined that Rubin owned the Jaguar. SFPD officers obtained a search warrant to place a GPS device on the vehicle for up to 30 days, but later cut short their GPS investigation to arrest Rubin at a motel in Oakland. Rubin had a loaded firearm when he was arrested. An SFPD officer had obtained another warrant to search Rubin's Vallejo, California apartment. Inside the apartment, police found oxycodone and other narcotics, firearm magazines, ammunition, and a bulletproof vest, plus clothing, shoes, and a backpack matching what the suspect wore during the robbery.

Rubin now moves to suppress the fruits of the SFPD officer's ALPR research and requests a hearing under Franks v. Delaware, 438 U.S. 154 (1978). The Court concludes that oral argument is unnecessary and denies Rubin's motion.

1
2
3
4
5
6
7
8
9
10
11
12

United States District Court
Northern District of California

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     BACKGROUND

On October 24, 2018, San Francisco Police Department Sergeant Stephen Jonas applied for a search warrant to install a GPS tracking device on a Jaguar automobile belonging to Rubin.  See Affidavit (Dkt. 95-1).

The affidavit explained that on October 14, 2018, pharmacist Ruzly Mantara arrived to work at a Safeway store in San Francisco and noticed a man sitting in a chair near the pharmacy.  Id. at 4.  When Mantara unlocked the pharmacy door, the man pushed Mantara into the pharmacy office, walked inside, and said "don't say anything, just give me what I want."  Id.  According to Mantara, the man was holding a firearm made of "black, textured plastic" and "in the shape of a rectangle with ridges on both sides."  Id.  The man made a shushing motion with his finger to his mouth, told Mantara that he wanted oxycodone, and told Mantara to "hurry up."  Id.  Mantara and the man walked to the office's controlled substance locker.  Id.  Mantara opened the locker and the man held out an open duffel bag.  Id.  As Mantara put medications from the locker into the backpack, the man said "give me the methadone."  Id.  After a burglar alarm activated, the man used his arm to sweep medications into his bag, then ran from the pharmacy.  Id.

When San Francisco Police Department officers arrived, Mantara told them that the man was black, 25-26 years old, roughly 6'1", and slim, with black hair in a buzz cut, a mustache, a deep voice, a medium complexion, smooth skin, and no visible scars, tattoos, or jewelry.  Id.  The man had been wearing black sunglasses, a green, white, and gray button-up shirt, and a backpack while carrying a separate duffel bag.  Id.

SFPD officers were able to capture still images of the suspect using Safeway surveillance videos.  Id. at 4–6.  They attempted to use those stills in a mugshot search to locate any matching individuals.  The mugshot search revealed one subject, Calvin Jones.  Id. at 6.  Based on photos of Jones, Sergeant Jonas was "unable to positively identify him or rule him out as a suspect."  Id.  SFPD officers also recovered fingerprints from surfaces that Mantara said the suspect had touched.  These prints were entered into local and national databases, but there were no matches.  Id. at 4.

United States District Court
Northern District of California

1    Surveillance video had captured a blue Jaguar park around the corner from the

2    Safeway before the robbery.  Id. at 6.  The video showed (at roughly the time of the

3    robbery) a man resembling the suspect running from the direction of the Safeway to the

4    Jaguar and entering its passenger side, after which the Jaguar drove away.  Id.  The

5    surveillance video partially captured the Jaguar's license plate (7CJ…67…).  Id. at 7.

6    Sergeant Jonas entered the partial plate into an Automated License Plate Reader (ALPR)

7    database.  Id. at 7–8.  The database located a blue Jaguar with the license plate 7CJX676.

8    Id. at 8.  Rubin was the vehicle's registered owner.  Id.  The database also contained

9    entries revealing the Jaguar's location at various points in time:

10           This Jaguar had one read in San Francisco on September 30, 2018 . . . .  The
             other recent ALPR reads for the Jaguar have been near Vallejo, California.
11           Several ALPR reads show the Jaguar parked in the late night hours in a
             gated, open-air residential parking complex . . . in Vallejo, California.
12

13   Id. at 8.

14        The affidavit also noted that Rubin had "prior firearms and narcotics arrests" and

15   was "on probation for carrying a loaded firearm."  Id.  Sergeant Jonas stated that he

16   believed Rubin and his blue Jaguar were "the same person and vehicle shown in the

17   surveillance video."  Id. at 9.  Thus, Sergeant Jonas believed that Rubin was "responsible

18   for this robbery."  Id.

19        Sergeant Jonas requested a warrant to use a GPS tracking device on Rubin's Jaguar

20   for 30 days.  Id. at 9.  Sergeant Jonas explained that such a device would enable law

21   enforcement to track the vehicle without being detected.  Id.  "[M]ost importantly, without

22   knowing the exact location of where this vehicle goes, we may not be able to determine the

23   exact location(s) where the suspect(s) and his/her co-conspirators live and/or conceal

24   stolen property and clothing related to the robberies or the new locations that he/they

25   intend to rob, and/or the escape route they take to leave the area."  Id.  "I fully believe that

26   if I am able to obtain the GPS locations for the subject vehicle, it will tend to show the

27   geographical locations consistent with robbery, lead to the location of concealed clothing

28   and weapons used during the robbery, and possibly lead to other accomplices."  Id. at 10.

1    A San Francisco Superior Court judge found that the affidavit established probable cause

2    and granted Sergeant Jonas's request.  Id. at 1.

3         On October 25, 2018, law enforcement located Rubin's car in Vallejo and placed

4    the GPS device on it.  See Jonas Decl. Investigation Report (dkt. 96-1) at 8; Mot. to

5    Suppress at 5–6.  Five days later, Sergeant Jonas obtained an additional search warrant to

6    search Rubin, his Jaguar, an Oakland motel room that officers knew Rubin was staying in,

7    and Rubin's Vallejo apartment.  See Jonas Decl. Investigation Report at 10; Mot. to

8    Suppress at 5–6.  SFPD officers arrested Rubin, who was armed, at the Oakland motel.

9    See Jonas Decl. Investigation Report at 10; Mot. to Suppress at 6.  And in Rubin's

10   apartment, officers found prescription bottles with oxycodone and other drugs, firearm

11   magazines, ammunition, a bulletproof vest, and a shirt, sunglasses, shoes, and backpack

12   that matched those seen in the robbery surveillance video.  See Jonas Decl. Investigation

13   Report at 11–12; Mot. to Suppress at 7.

14        The government charged Rubin with one count of interference with commerce by

15   robbery in violation of 18 U.S.C. § 1951(a) and one count of brandishing a firearm in

16   furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A).  See

17   Indictment (dkt. 1).  Rubin now moves to suppress the fruits of Sergeant Jonas's ALPR

18   database research and requests a hearing under Franks v. Delaware, 438 U.S. 154 (1978),

19   based on alleged omissions in Sergeant Jonas's first warrant application (that is, the

20   application to place a GPS-device on Rubin's Jaguar).  See Mot. to Suppress at 7–26.

21   **II.    LEGAL STANDARD**

22        Under the Fourth Amendment, "[t]he right of the people to be secure in their

23   persons, houses, papers, and effects, against unreasonable searches and seizures,

24   shall not be violated."  U.S. Const. Amend. IV.  Unless an exception applies, the

25   exclusionary rule prevents unlawfully obtained evidence from being introduced at trial

26   against the person whose Fourth Amendment rights were violated.  See Mapp v. Ohio, 367

27   U.S. 643, 655 (1961).  This includes other evidence "come at by exploitation of that

28   illegality."  Wong Sun v. United States, 371 U.S. 471, 488 (1963) (quotation omitted).

United States District Court
Northern District of California

4

United States District Court
Northern District of California

Police may search a constitutionally protected area when they have a warrant supported by probable cause.  Katz v. United States, 389 U.S. 347, 357–58 (1967).  Probable cause exists when "the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."  Ornelas v. United States, 517 U.S. 690, 696 (1996).  This "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Illinois v. Gates, 462 U.S. 213, 243–44 n.13 (1983)).

Different rules apply when a magistrate's probable cause determination may have rested on false or misleading information.  When a defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."  Franks, 438 U.S. at 155–56.  Thus, to be entitled to a Franks hearing, a defendant must make a substantial preliminary showing of (1) a knowing or reckless misrepresentation or omission in the warrant application, that (2) is material to the probable cause question.  See United States v. Chavez-Miranda, 306 F.3d 973, 979 (9th Cir. 2002).  Then, if "the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence" at the Franks hearing, "and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit."  Franks, 438 U.S. at 156.

## III.    DISCUSSION

Rubin argues that when Sergeant Jonas accessed Rubin's records in the Northern California Regional Intelligence Center (NCRIC) ALPR database, Sergeant Jonas engaged in a warrantless search in violation of the Fourth Amendment.  He also argues that the affidavit supporting the application to place a GPS device on Rubin's vehicle omitted

5

information that would have been material to the magistrate's probable cause finding and included several improper opinions about Rubin's guilt.  The Court addresses these arguments in turn.

### A.     ALPR Database Research

Sergeant Jonas's access to Rubin's ALPR data did not constitute a Fourth Amendment search.

The doctrine governing whether a Fourth Amendment search has occurred incorporates both "common-law trespass" principles, which require asking whether the government acquired "information by physically intruding on a constitutionally protected area," United States v. Jones, 565 U.S. 400, 405, 406 n.3 (2012), and principles relating to "certain expectations of privacy . . . that society is prepared to recognize as reasonable," Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018) (quotation omitted).  Even under the latter set of principles, pertaining to "which expectations of privacy are entitled to protection," courts must weigh certain "historical understandings."  Id. at 2214.  For example, the Fourth Amendment "seeks to secure 'the privacies of life' against 'arbitrary power,'" and a "central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'"  Id. (quoting Boyd v. United States, 116 U.S. 616, 630 (1886); United States v. Di Re, 332 U.S. 581, 595 (1948)).

These "understandings" remain relevant "when applying the Fourth Amendment to innovations in surveillance tools."  Id.  "As technology has enhanced the government's capacity to encroach upon areas normally guarded from inquisitive eyes," Fourth Amendment jurisprudence has attempted to preserve "that degree of privacy against government that existed when the Fourth Amendment was adopted."  Id. (quoting Kyllo v. United States, 533 U.S. 27, 34 (2001)).  Thus, when evaluating a particular technology, courts "must take account of more sophisticated systems that are already in use or in development."  Id. at 2218 (quoting Kyllo, 533 U.S. at 36).  For example, "use of a thermal imager to detect heat radiating from the side of the defendant's home was a search . . . [b]ecause any other conclusion would leave homeowners 'at the mercy of advancing

6

technology.'"  Id. (quoting Kyllo, 533 U.S. at 35) (internal citation omitted).  And police "must generally obtain a warrant before searching the contents of a phone" given the "vast store of sensitive information" that one contains.  Id. (citing Riley v. California, 573 U.S. 373 (2014)).

The question whether obtaining specific data that reveals a defendant's location history constitutes a Fourth Amendment search implicates various cases addressing "a person's expectation of privacy in his physical location and movements."  Id. at 2215.  For example, United States v. Knotts held that the government's use of a beeper's signal to track a vehicle through traffic, a form of "augmented" visual surveillance, was not a search because a "person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another" and the vehicle's movements had been "voluntarily conveyed to anyone who wanted to look."  Id. (quoting 460 U.S. 276, 281, 282 (1983)).  That said, Knotts "emphasized the 'limited use which the government made of the signals from this particular beeper' during a discrete 'automotive journey.'"  Id. (quoting Knotts, 460 U.S. at 284, 285).  The answer would have been different if "twenty-four hour surveillance" had been "possible."  Id. (quoting Knotts, 460 U.S. at 283–84).  Thus, when Jones considered whether placing a GPS tracking device on a vehicle and thereby monitoring "the vehicle's movements for 28 days" constituted a search, the answer was yes.  Id. (citing Jones, 565 U.S. at 404–05).  Although Jones was "based on the government's physical trespass of the vehicle" (i.e., the physical placement of the GPS device on the vehicle without a warrant), "five Justices agreed that related privacy concerns would be raised by, for example, surreptitiously activating a stolen vehicle detection system in Jones's car to track Jones himself, or conducting GPS tracking of his cell phone."  Id. (quotations omitted).  In sum, long-term GPS monitoring that tracks "every movement" a person makes in a vehicle may typically violate a defendant's reasonable expectation of privacy, "regardless whether those movements were disclosed to the public at large."  Id.

Applying these principles, Carpenter held that because cell phone location

information is "detailed, encyclopedic, and effortlessly compiled . . . an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through" that information, such that obtaining cell site location information is a Fourth Amendment "search." Id. at 2216, 2217. "Prior to the digital age, law enforcement might have pursued a suspect for a brief stretch," but "society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period." Id. at 2217 (quotations omitted). The government "contravenes that expectation" when it accesses cell site location records because "[m]apping a cell phone's location" over many days "provides an all-encompassing record of the holder's whereabouts." Id.

Neither the Supreme Court nor the Ninth Circuit has addressed whether using an automated license plate reader system constitutes a search. See United States v. Yang, 958 F.3d 851 (9th Cir. 2020) (declining to address the question). But concurring in Yang, Judge Bea explained that the use of an automated license plate database was not a search because there was no evidence that the database at issue "revealed the whole of [the defendant's] physical movements." Id. at 862 (Bea, J., concurring). The database contained, "on average, four unique entries annually for vehicles that had been identified" by an automated license plate reader. Id. And despite the general "increasing ubiquity of ALPRs," the database at issue had contained only "a single entry" for the relevant vehicle. Id. at 863. "[E]ven accepting" that the database's records "revealed where [the defendant] lived, it exposed nothing else about his 'particular movements' whatsoever." Id. (quoting Carpenter, 138 S. Ct. at 2217). Judge Bea acknowledged "that ALPRs may in time present many of the same issues the Supreme Court highlighted in Carpenter" because they could "effortlessly, and automatically, create voluminous databases of vehicle location information," and this information could eventually enable law enforcement "to identify quickly and easily the precise whereabouts and lifestyle habits" of drivers. Id. (emphasis in original). But until a database of this sort "evolves to provide comparable location

United States District Court
Northern District of California

information to the records at issue in Carpenter," holding that the search of an ALPR database "requires a warrant currently based on the future risk of a violation . . . would be folly." Id. at 864.

Here, as in Yang, Rubin asks the Court to hold that accessing an ALPR database constitutes a search because of the general increasing ubiquity of ALPR's, despite the limited information revealed by the NCRIC ALPR database here. See Mot. to Suppress at 9–16. The Court declines to do so. Although it is not clear precisely how many entries the NCRIC ALPR database contained for Rubin's vehicle, there is no reason to believe that the database provided a detailed log of Rubin's movements. The investigation report stated that the ALPR database contained "one read in San Francisco" on September 30, 2018 and "other recent ALPR reads . . . near Vallejo, CA." See Jonas Decl. Investigation Report at 7; see also Affidavit at 8 (stating the same).[1] Thus, even if each of these reads occurred "within the previous month" (as Rubin argues "may" have been the case), see Reply (dkt. 97) at 5, the database revealed little more than where Rubin was probably living based on hits in Vallejo. See Affidavit at 8. Indeed, as Rubin acknowledges, Sergeant Jonas "specifically searched for th[e] Jaguar entering or driving in San Francisco and located only one reading in the ALPR database"—though we now know that Rubin's car traveled to, within, and from San Francisco for the robbery. See Mot. to Suppress at 15.

Accordingly, although this ALPR database contained more information about Rubin than the single entry at issue in Yang, and the precise volume of information is unknown, it is clear that the information was not remotely comparable to the "detailed, encyclopedic" information at issue in Carpenter. 138 S. Ct. at 2216.[2] Unlike the cell-site location records

---

[1] Sergeant Jonas has declared under penalty of perjury that he has been unable to locate a copy of the NCRIC ALPR report that he pulled for Rubin. See Jonas Decl. ¶ 8.

[2] Rubin says there are "disputed facts" regarding the timing of entries for Rubin in the NCRIC ALPR database. Reply at 5. The government states that the affidavit described all entries for the past 12 months, while Rubin argues that the affidavit may have referred only to entries for the past month. See Opp. (dkt. 96) at 15; Reply at 5. Although Rubin has not requested an evidentiary hearing to resolve this dispute, the Court reiterates that even if all of the ALPR entries referenced in the affidavit occurred within one month, the database did not disclose enough information to

there, the data here provided no more information than what could have been obtained through police surveillance.[3]  And the Supreme Court's instruction to pay careful attention to advancing technology, see id. at 2218, does not support holding that a Fourth Amendment search occurred based merely on Rubin's prediction that "[i]t will not be long before" ALPR databases contain significantly more detailed information.  See Reply at 6. Therefore, Judge Bea's sound reasoning applies equally here.

Because accessing the ALPR database was not a Fourth Amendment search, the Court rejects Rubin's argument that all evidence obtained as a result of the ALPR research should be suppressed.

### B.    Franks

Rubin's argument that the Court must hold a Franks hearing fares no better.

As discussed above, to decide whether Rubin is entitled to a Franks hearing, the Court must determine whether Rubin has made "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," or that the affidavit intentionally or recklessly omitted any information.  438 U.S. at 156.  If so, the Court must determine whether the false statement or omission was material, i.e., "necessary to the finding of probable cause."  Id.

Rubin argues that Sergeant Jonas's affidavit omitted the following information:

> (1) Mr. Mantara had stated that he had never seen the suspect before and did not recognize him.

> (2) Due to his previous arrets, Rubin would have been in the mugshot database that resulted in only one match to another person.

---

raise Fourth Amendment concerns.
[3] Rubin does not dispute that police could have used other databases (including DMV records) to figure out the Jaguar's license plate number.  See Opp. at 10. And Rubin himself argues that police already knew his address.  See Reply at 9.  Thus, the ALPR database did not provide significant information of value, let alone the sort of detailed information that would raise concerns under Carpenter.

United States District Court
Northern District of California

(3) Rubin's fingerprints would have been in the fingerprint database that did not return a match.

(4) Sergeant Jonas had not requested that the crime lab manually compare Rubin's fingerprints to the prints taken from the crime scene, but would make such a request the same day that he applied for the warrant to place a GPS device on Rubin's vehicle.

(5) Rubin had metal braces on his teeth at the time of the robbery and when he was later arrested.  Mantara would have been able to see the braces because the suspect spoke to him, but Mantara did not describe the suspect as having had braces.  Braces are also not visible in the surveillance footage.

(6) Law enforcement already had an exact address for Rubin based on a separate Accruint database search.

See Mot. to Suppress at 20.  Rubin also argues that Sergeant Jonas's statements that he believed Rubin was responsible for the robbery and used his Jaguar to commit the robbery were improper opinions and thus must be "excised" from the affidavit.  Id. at 21.

The warrant application easily established probable cause because it contained information that the robbery suspect fled the scene in Rubin's vehicle:  the surveillance video captured the robbery suspect running to the vehicle and leaving in it.  Thus, there was a "fair probability or substantial chance" that tracking the vehicle would lead to evidence relevant to the robbery.  See Wesby, 138 S. Ct. at 586.   That evidence could include not just where the vehicle's owner lived, but also where any co-conspirators lived or were located, plus where the suspect's clothing and the stolen property were located.  See Affidavit at 9.

Given the strength of that information in the affidavit, none of these purported omissions or improper statements was material.  Mantara's statement that he had never seen the suspect before has no bearing on whether the additional information about the Jaguar established probable cause.  And the warrant affidavit disclosed that mugshot and fingerprint databases had not pointed to Rubin.  In any event, information that Rubin would have been in the mugshot and fingerprint database was immaterial because (i) it would not override the fact that his car was apparently used in the robbery; and (ii) the

11

affidavit clearly implied that at least two people, including a getaway driver who did not enter the store, participated in the robbery.  For the same reasons, information about Sergeant Jonas's eventual request for a manual fingerprint comparison and information about Rubin's braces would not have changed the probable cause determination. Furthermore, assuming that law enforcement did not need a search warrant to determine where Rubin lived, the warrant would nonetheless have established probable cause to track the Jaguar because there was a fair probability that doing so could have led police to evidence regarding co-conspirators and the location of evidence including stolen property.[4] Finally, removing Sergeant Jonas's statement that he believed Rubin was responsible for the robbery and had used his Jaguar to commit the robbery has no impact on the probable cause analysis because the affidavit's statements about the surveillance footage and Rubin's car were more than enough to establish probable cause.

Because any misstatements or omissions were not material, the Court need not consider other factors relevant to the <u>Franks</u> analysis.

## IV.    CONCLUSION

For the foregoing reasons, the Court denies Rubin's motion to suppress and request for a <u>Franks</u> hearing.

**IT IS SO ORDERED.**

Dated: August 25, 2021

_____
CHARLES R. BREYER
United States District Judge

United States District Court
Northern District of California

---

[4] Rubin mischaracterizes the affidavit by suggesting that determining where Rubin lived was the "most important" reason for placing the GPS device on Rubin's Jaguar.  <u>See, e.g.</u>, Mot. to Suppress at 23.  The affidavit actually said:  "[M]ost importantly, without knowing the exact location of where this vehicle goes, we may not be able to determine the exact location(s) where the suspect(s) and his/her co-conspirators live and/or conceal stolen property and clothing related to the robberies or the new locations that he/they intend to rob, and/or the escape route they take to leave the area."  Affidavit at 9.  The affidavit thus categorized numerous purposes under the heading "most importantly."  And even if one of those purposes was not important, the others were.